# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

VONLEE NICOLE TITLOW, # 384878,

                    Petitioner,

v.                                    Case Number: 07-CV-13614
                                    Honorable Marianne O. Battani

S.L. BURT,

                    Respondent.

_____/

## OPINION AND ORDER
## (1) DENYING PETITION FOR WRIT OF HABEAS CORPUS, (2) ISSUING A CERTIFICATE OF APPEALABILITY, AND (3) GRANTING AN APPLICATION FOR LEAVE TO PROCEED ON APPEAL *IN FORMA PAUPERIS*

## I.    INTRODUCTION

Pending before the Court is Petitioner Vonlee Nicole Titlow's[1] petition for writ of habeas corpus, filed under 28 U.S.C. § 2254.  (Dkt. #1).  Petitioner is a state inmate currently incarcerated at the Bellamy Creek Correctional Facility[2] in Ionia, Michigan.  On March 20,

---

[1]Petitioner took on the appearance of a woman and preferred to be called "Nicole." According to the Michigan Department of Corrections website, she is incarcerated at a male facility and is listed as a male.  However, her appearance is that of a woman.  At trial, witnesses used a combination of male and female pronouns when referring to Petitioner.  Accordingly, some quotations from the trial record refer to Petitioner as a female.  This opinion will refer to Petitioner as a female.

[2]At the time Petitioner filed her habeas petition, she was incarcerated at the Southern Michigan Correctional Facility in Jackson, Michigan.  The proper respondent in a habeas case is the habeas petitioner's custodian, which in the case of an incarcerated petitioner is the warden of the facility where the petitioner is incarcerated.  Rule 2(a) of the Rule Governing § 2254 Cases; *see also Edwards v. Johns*, 450 F.Supp.2d 755, 757 (E.D. Mich. 2006).  In most cases where a petitioner is transferred to a different facility after the petition has been filed, the Court would order an amendment of the case caption.  However, because the Court is denying the petition in this case, it finds no reason to do so.

2002, Petitioner was convicted of one count of aiding and abetting a second-degree murder,[3] by an Oakland County, Michigan, Circuit Court jury. On April 17, 2002, she was sentenced to a prison term of twenty to forty years for that conviction. In her *pro se* pleadings, Petitioner challenges her conviction and sentence on the following grounds: (1) her trial counsel was ineffective in advising her to withdraw her plea, in representing her when there was a conflict of interest, in failing to impeach the prosecution's star witness, in failing to object to the prosecutor's misconduct, in failing to object to the jury instructions, and in failing to request an abandonment jury instruction, (2) prosecutorial misconduct, (3) the trial court erred in failing to respond to a deliberating juror's question of law, (4) the trial court erred in giving an improper jury instruction which shifted the burden of proof, (5) there was insufficient evidence, (6) abuse of discretion by the trial court in failing to suppress evidence of a tainted photograph line-up, (7) her sentence was unconstitutional, and (8) her appellate counsel was ineffective. For the reasons stated below, the Court will deny the petition. The Court, however, will issue Petitioner a certificate of appealability and will grant her an application for leave to proceed on appeal *in forma pauperis*.

## II.  BACKGROUND

Petitioner's troubles in this case arise from an incident which occurred on August 19, 2000, resulting in the death of her uncle, Donald Rogers. According to the prosecution's theory, Petitioner agreed to help her aunt, Billie Rogers, kill Donald so that Billie could inherit Donald's estate. Petitioner planned to pay for a sex-change operation with a share of the proceeds.

Trial began on March 11, 2002, and lasted seven days. Troy Police Officer Lynn Giorgi

---

[3]MICH. COMP. LAWS § 750.317.

testified first.

According to Officer Giorgi, on August 12, 2000, at 4:25 a.m. she was dispatched to 2090 Grenadier Street in Troy, Michigan, regarding a man who was unconscious and not breathing. Officer Giorgi and Officer Pete Dungjen arrived at the same time. When the officers arrived, two women met them at the door and were standing in the foyer. One woman was Billie Rogers, the decedent's wife, and the other was Petitioner. The officers were directed into the kitchen where they found Donald Rogers on the floor. A plastic glass was near his left hand. There was no fluid on the ground and it did not smell of alcohol. An over-turned chair was also by his head.

Officer Giorgi testified that she had to move the chair slightly to reach Mr. Rogers. The sink in the kitchen was not far from his body. She said Mr. Rogers's legs were crossed. It was clear to both officers that he was dead.

Officer Giorgi further testified that she did not see any signs of trauma, such as blood. As for Mr. Rogers's facial marks, she did not believe them to be unusual at the time.

According to Officer Giorgio, they then went to talk to Billie Rogers to get Mr. Rogers's medical history. She said Billie Rogers was very calm and chain-smoking cigarettes. She initially thought that Billie was in shock because she did not ask any questions and, when offered the opportunity to call family, she declined. When asked to explain what had happened, Billie told the police that she and Petitioner had gone to the casino without Mr. Rogers and, when they returned, they found him on the floor. Billie said they entered the house through the garage door entrance. Billie told the officers that her husband was an alcoholic.

Billie also told the officers that Donald had previously passed out and hit his head on the

bathtub. Billie said he refused medical treatment. She also said he suffered from rectal bleeding, and showed them a chair with dried bloodstains.

Officer Giorgio testified that Petitioner was very upset. She said Petitioner was yelling and swearing at her, saying, "you know, he's just dead." Trial Tr. vol. II, 56, Mar.12, 2002. Petitioner accused the officer of being rude. Petitioner did not appear drunk to the officer.

Officer Giorgi gave Billie and Petitioner written statements to fill out. Petitioner did not want to make a statement. Petitioner began writing a statement, but then put down the pen and asked why it was necessary. Petitioner then provided the officers with a short written statement. That statement was admitted into evidence.

Officer Giorgi did not see any liquor bottles, other than those placed on the shelves behind the bar in the family room and in the pantry in the kitchen. The bottles in the pantry were sealed. She said the house was neat.

Officer Pete Dungjen also testified. He said he was a licensed emergency medical technician and was dispatched that day for an unexpected death at 2090 Grenadier Street. He said he was met at the house by Petitioner and Billie Rogers. According to Officer Dungjen, Billie told them, "he's lying in there," and motioned toward the kitchen. Trial Tr. vol. II, 113, Mar. 12, 2002. He said both women were calm.

Officer Dungjen testified that he believed that Mr. Rogers had been dead for some time because his body was cold. He said he saw fluid in the cracks on the floor, believing that it was from a glass near Mr. Rogers's hand.

Officer Dungjen further testified that he remained with the paramedics, while Officer Giorgi went to talk to Petitioner and Billie. He said, even though he was in another room, he

heard Petitioner yelling at Officer Giorgi. He said Petitioner did not appear drunk, but it was his opinion that Petitioner's behavior was unusual. He said Billie remained calm.

Billie Rogers told Officer Dungjen that her husband was an alcoholic, who drank one to two gallons of alcohol a day. Officer Dungjen saw a glass next to the coffee table in the family room and a plastic glass by Mr. Rogers's hand. There was also a pair of women's shoes by the couch. The glass had a clear liquid in it. Bottles of alcohol were set up behind the bar and in the pantry. One bottle in the pantry was one-quarter to one-half full.

Officer Dungjen testified that Billie told him that the glass and the shoes by the couch in the family room belonged to her. She also told him what she had told Officer Giorgi; that they came in through the garage entrance and that she had gone to get a glass of water. Officer Dungjen assumed that she got the glass of water from the kitchen. She said, after she returned to the family room, she got up again, went into the kitchen and found her husband.

Officer Dungjen said he did not believe that Billie would not have seen her husband earlier because his body was visible from the family-room entrance as well as from the sink area in the kitchen. He also believed that the position of Mr. Rogers's body was unusual in that his legs were crossed at the ankles and under the table. Because of the over-turned chair, Officer Dungjen believed that Mr. Rogers's body should have been on its side rather than on its back.

Community EMS employee Jeffrey Berryhill testified next. He said, once he arrived at the scene, he was informed that someone had died. According to Berryhill, Mr. Rogers's body displayed lividity and rigor mortis. He said it took twenty minutes to one hour for rigor mortis to set in. Mr. Rogers was pronounced dead at 4:50 a.m.

Berryhill testified that Petitioner and Billie Rogers's reactions were unusual. He also

found Mr. Rogers's body position unusual. He said, if Mr. Rogers had fallen, then it would have

been unusual for him to end up with his legs crossed. He also would have expected to see more

trauma to Mr. Rogers's body if he had fallen.

Danny Chahine testified next. He said he met Petitioner at Motor City Casino in June

2000. Billie Rogers was with Petitioner when he met her. Chahine said he saw Petitioner at the

casinos at least thirty times. On almost all of those occasions, Billie Rogers was with Petitioner.

He said Petitioner lived with the Rogers.

Chahine testified that Petitioner told him that Mr. Rogers had ten million dollars.

Petitioner also told Chahine that the Rogers's had an unhappy marriage.

Chahine further testified that, on August 12, 2000, he received a telephone call from

Petitioner, telling him that Mr. Rogers died. Petitioner told Chahine that when she and Billie

returned from the casino, they found Mr. Rogers dead on the kitchen floor.

Chahine said when he asked Petitioner how Mr. Rogers died, Petitioner, who was crying,

said that the police came and asked too many questions. Chahine testified that he thought that

unusual. Chahine asked Petitioner if she and Billie had done anything. Petitioner told him she

would tell him everything later.

Petitioner had previously told Chahine that Billie wanted to get rid of her husband.

Petitioner told him that Billie would pay $25,000 to get rid of him.

Chahine testified that, on one occasion, when he came to pick up Petitioner, the Rogers

were fighting. When Chahine asked why, Petitioner told him that they were arguing over

Billie's $13,000 credit card bill (Billie's bill at the casino). Chahine testified that Petitioner told

him many times that Billie wanted to get rid of her husband.

Petitioner told Chahine that Billie invited her (Petitioner) up from Tennessee to Michigan because she wanted to catch them in a compromising position and then use that information against her husband in a divorce because she did not want to lose the money.

Chahine testified that he believed that Petitioner was a woman, adding that he had a boyfriend-girlfriend relationship with her. He said they also had sex, twice, but he did not see anything which would have led him to believe that Petitioner was a man. The first time, Petitioner performed oral sex on him and she was topless. The second time, Chahine had sex with her from behind. Chahine testified that while it hurt him to testify against Petitioner, he had to tell the truth for Mr. Rogers's family and for himself, because he did not want to live with the knowledge that Petitioner and Billie had killed Mr. Rogers.

Chahine testified that, the day after Mr. Rogers died, Petitioner invited him to the house. Petitioner was crying a lot and showed Chahine where they had found his body. Chahine said Billie acted like nothing had happened.

Petitioner showed Chahine the suit that they were going to have Mr. Rogers wear. Petitioner told him that Billie wanted Mr. Rogers cremated as quickly as possible. Apparently the family did not want to let Billie do that; however, she (Billie Rogers) pushed for it and Mr. Rogers was allegedly cremated.

Petitioner and Billie gave Chahine what they called "sex tapes" and they claimed that Mr. Rogers had watched them. Originally they were going to throw the tapes away, but he asked to look at them. When he watched the tapes, he did not see anything sexual in nature. Rather, he

saw Mr. Rogers and his children playing by the water.

Chahine testified that, the following day, Chahine and Petitioner met for dinner at the casino. Petitioner came with Billie. Petitioner told him that she wanted to treat him to dinner, which was unusual. Even though Billie was invited to dinner, she declined because she was playing the slot machines.

At dinner, Petitioner told Chahine that she and Billie had walked into the house, on the night in question, at around 3 a.m., and found Mr. Rogers passed out on the floor. She said Billie suggested they do what they had planned. Billie then got some vodka bottles and started pouring vodka in her husband's mouth. Petitioner told Chahine that one of them would then pinch his nose and the other one would put the vodka in his mouth. When Mr. Rogers gasped for air, Petitioner said she let him breath; she knew that Billie wanted to kill him, but Petitioner told Chahine that she couldn't do it. According to Petitioner, Mr. Rogers would not die and Billie told her that she had to help her and that she would pay $50,000.

Petitioner said Billie told her that they had to do it because in the morning Mr. Rogers would know that they had tried to kill him and that would be the end of Billie. Billie told Petitioner that she needed help to hold Mr. Rogers down. Billie then got a pillow and put it on her husband's face.

Petitioner told Chahine that Billie told the family that she and Petitioner came back from the casino at 11 p.m., but that she (Petitioner) told the police that it was 3 a.m. Petitioner told Chahine that she believed that was what caused the police to investigate. Petitioner told Chahine that they had thrown the pillow and vodka bottle onto the freeway.

Chahine testified that Petitioner added that she also had to tell him the truth about something else.  She then told him that she was not a woman, but a man.  Chahine asked Petitioner to "show him" because he did not believe it.  They went to the parking lot, got in the car and Petitioner told him the same story.  Chahine asked Petitioner why she was telling him the story because if it ended up in court he would have to testify.  Petitioner stated that no one would believe Chahine because he (Chahine) had a record and was a foreigner while she (Petitioner) and Billie were white women with no records.

Chahine admitted that, in 1987, he had been arrested for possession of cocaine, but the charge was dismissed.  He also pleaded guilty to possession of cocaine in 1989.  He denied using cocaine.

In between those charges, Chahine said he filled out a citizenship form and answered negatively when asked if he had been arrested and convicted of a crime.  He said he then pleaded guilty to falsely answering a citizenship application because of his misunderstanding about the question asked and his fear of being deported to Lebanon.  He was placed on probation for two years; the probationary period expired.

Chahine said he and Petitioner then went back into the casino.  Petitioner asked Billie for $700.  Billie took out a checkbook with $100,000 written in it.  Twenty thousand had been deducted and Billie subtracted another $700.  Chahine identified the checkbook in court.

According to Chahine, one of Billie's daughters told her (Billie) that she should give Petitioner $100,000 because she knew what they had done and that Petitioner should be paid more than $50,000.

After thinking about what Petitioner told him for one week, Chahine called a friend who

was a police officer in Bloomfield Township. He asked him if he thought there was any need for him to talk to the Troy police. Chahine was put in contact with Detective Tullock, who asked if he would wear a wire. Chahine agreed.

After Petitioner called to arrange for a dinner, Chahine had the wire hooked up. The tape was recorded on September 1, 2000. It was admitted at trial and played for the jury.

On the tape, Petitioner made some comments about Chahine being an alibi for them. Petitioner had previously asked Chahine to be their alibi but he declined.

Chahine testified that, after Mr. Rogers died, Billie bought Petitioner a new car. Billie also bought herself a black Cadillac within days of her husband's death. Petitioner also showed Chahine a deposit slip for $60,000.

Chahine said Petitioner told him that, while smothering Mr. Rogers, he had played with her breasts. She told Chahine she thought he died happy because he was fondling her breasts. Petitioner said Mr. Rogers's death was a mercy killing. She said she would use the money from Billie for a sex-change operation.

Because Chahine was aware he was taping Petitioner, he said he was emotional. He said Petitioner asked him several times if was taping their conversation. Chahine said he denied taping the conversation. He told Petitioner he would not blackmail them.

Oakland County Medical Examiner Ljubisa Jovan Dragovic testified that, at 5:11 a.m. on August 12, 2000, his office was contacted by Officer Dungjen and told about Mr. Rogers's death. Robert Allegrina, a former police officer, who worked as an investigator, went to the scene. Mr. Rogers's body was then taken to the medical examiner's office. No autopsy was

performed; however, Deputy Oakland County Medical Examiner Dr. Ortiz-Reyes viewed the body and took some samples for toxicology. Dr. Ortiz-Reyes originally indicated that the cause of death was a heart attack. The cause of death was determined on the basis of a statistical inference from

information received during the investigation. Mr. Rogers's body was released on August 12, 2000, to a funeral home with authorization from Billie.

On August 14, 2000, the findings came back from toxicology; Mr. Rogers's blood alcohol level was .44 and his urine alcohol level was .47. Dr. Dragovic said such a level would be lethal to someone who was not used to drinking. He testified that, to reach that level of intoxication, a person would have to drink a fifth and one-half or two fifths. Given that Mr. Rogers was reportedly an alcoholic, Dr. Dragovic opined that that level was not lethal for him.

Upon receiving the toxicology results, Dr. Ortiz-Reyes added acute alcohol intoxication as the cause of death with arterial sclerotic cardiovascular disease as a contributing factor. No further examination of the body was done because Dr. Ortiz-Reyes believed that Mr. Rogers had already been cremated, although mistakenly.

Dr. Dragovic further testified that normally urine alcohol levels were thirty percent higher than blood alcohol levels. The difference between the two levels indicated that something interceded to prevent further absorption of alcohol as well as the fact that there was loading of alcohol into Mr. Rogers. He testified that death was a factor which could accomplish that result. When someone died of acute alcohol intoxication, there would be foamy watery fluid escaping from the mouth and nose.

Dr. Dragovic testified that after Dr. Ortiz-Reyes's examination, he was in contact with

the

police regarding the investigation of a claim that Mr. Rogers was smothered. Upon reviewing the photographs, Dr. Dragovic thought that it was strange that there was no obvious sign of trauma because the floor on which Mr. Rogers had allegedly fallen was hard marble. He also noted that Mr. Rogers's black eye was a healing injury, at least two days old, and not caused by a fall. He also thought it unusual that Mr. Rogers's legs were crossed. According to Dr. Dragovic, the scene did not "make any sense." Trial Tr. vol. III, 207, Mar. 14, 2002.

Upon reviewing enlargements of the pictures at the scene, Dr. Dragovic noticed fine scrapes on the left part of the nose, the tip of the nose, the upper border of the lip and the upper and lower left eyelids, which were obscured by the earlier eye injury. He opined that those injuries were the result of contact with a rougher surface and friction and that the rougher surface could be a pillow with a weave. Dr. Dragovic believed that those injuries had to have occurred while Mr. Rogers was alive because of the color of the scrapes. Dr. Dragovic testified that smothering might or might not leave a mark on a victim's body depending on the victim's ability to defend and the material used. He explained that in the early nineteenth century, there was a pair of grave robbers named Burke and Hare. They realized that they could provide fresher bodies to medical schools for research by taking people who were intoxicated and suffocating them because they could not resist. That became known as burking. The types of marks on Mr. Rogers's body were an example of "burking." Trial Tr. vol. IV, 49, Mar. 15, 2002.

On December 5, 2000, Dr. Dragovic issued an affidavit to correct the death certificate to reflect that the cause of Mr. Rogers's death was asphyxia by smothering, with acute alcohol intoxication as a contributing factor. The manner of death was homicide.

Troy Police Detective Donald Bullock testified that, on August 30, 2000, he was called by a Bloomfield Township officer and told about Chahine. Chahine went in for an interview. The next day, Chahine was outfitted with a recording device. Neither Detective Tullock nor the Oakland County Prosecutor's office ever offered Chahine anything for his testimony.

Troy Police Detective Donald Zimmerman testified that he executed a search warrant for Billie Rogers's house on January 6, 2001. Pursuant to the warrant, Billie gave Detective Zimmerman two checkbooks. One of the checkbooks was the one that was identified by Chahine. In the back of that checkbook was Petitioner's name with the notation "100,000." Underneath the "100,000" appeared the numbers "70,260" and "700." The number "70,260" was the amount of the check Billie had written to Petitioner to buy a certificate of deposit and open a savings and checking account. The checkbook also showed a notation for "$19,838," the approximate cost of Petitioner's car.

Chicago Police Detective John Griffin testified that on January 4, 2001, he assisted in Petitioner's arrest. At that time, Petitioner had an apartment in Chicago. Upon hearing that she was being arrested for Mr. Rogers's murder, Petitioner stated, "[W]here's my aunt? Is my aunt under arrest too?" Trial Tr. vol. IV, 9, Mar. 15, 2002.

Amy Mouradian testified that she was an operations consultant for Bank One. Her review of bank records revealed the following: Billie Rogers wrote a check for $50,576.00 to Suburban Olds Cadillac on August 21, 2000. On August 24, 2000, she wrote a check for $19,837.30 to Suburban Olds Cadillac. On that same date, she had $100,000.00 transferred to her Bank One account and wrote Petitioner a check for $70.260.00. On August 25, 2000, Petitioner opened a certificate of deposit account with the money and then withdrew $5,000.00

to put in a savings account and $4,000.00 to put in a checking account.

Randall Pangretic, a manager at Merrill Lynch in Bloomfield Hills, said a review of Mr. Rogers's accounts showed they were worth $1,778,603.00, on August 31, 2000, with Billie as beneficiary. On August 24, 2000, she transferred $100,000.00 from one of the accounts.

Paul Livernois, a salesperson for Suburban Oldsmobile Cadillac, testified that, on August 17, 2000, Billie bought a 2000 Cadillac Seville to be delivered or picked up on August 21. Petitioner bought a 1997 Buick Riviera on August 21 when she was there with Billie. Petitioner picked up the Buick Riviera (paid for by Billie) on August 24.

Attorney Donald McGinnis testified that he prepared Mr. Rogers's will and that Billie was the sole beneficiary of his estate.

The parties stipulated that Billie had given her daughter and future son-in-law $250,000 for a business and bought a $108,000 house for her mother, paid for in cash, after her husband's death.

Robert Allegrina, an investigator with the Oakland County Medical Examiner's Office for thirteen years, arrived at the scene at 6:10 a.m. Billie told him she was not opposed to an autopsy. He was aware of Officer Dungjen's suspicions regarding the placement of the body.

Dr. Bader-Cassin, the medical examiner for Washtenaw and Livingston counties, testified for the defense. He said Mr. Rogers died of acute alcohol intoxication. According to Dr. Bader-Cassin, a .44 blood alcohol level was a lethal level. He said a chronic alcoholic was more likely to be compromised at that level. He said the difference between the blood alcohol level and the urine alcohol level only indicated that Mr. Rogers had been drinking over a prolonged period of time. Any alcohol which might have been poured down Mr. Rogers's throat or in his

nose would have been negligible because he had already reached a fatal blood alcohol level.

Upon viewing the photographs, Dr. Bader-Cassin testified that the scene did not look staged. However, Dr. Bader-Cassin agreed that if Mr. Rogers fell dead from the chair in the picture, he would not have fallen in the position in the photograph. While Dr. Bader-Cassin saw bruises on Mr. Rogers's face, he could not say what they were or how they got there. Dr. Bader-Cassin admitted that he could not rule out smothering as a cause of death. He also agreed that with "burking" there might be very little or no evidence left behind. Dr. Bader-Cassin also agreed that if Mr. Rogers was unconscious from alcohol, then depriving him of oxygen could further injure his body.

Petitioner testified. She said her name was Harry Vonlee Titlow, but she changed it to Nicole Vonlee Titlow when she was eighteen. She said she was a nail technician and worked as an escort. She said she could earn $2,000 or $3,000 a week escorting. She said she ran an escort service in Denver and Chicago. She denied being a pimp.

Petitioner testified that she was drinking heavily, even though she was going to Alcoholics Anonymous (AA). She said she decided to move to Tennessee with her grandmother and start over. She said she was working at the Waffle House and going to AA meetings.

Petitioner testified that she was having a hard time because she did not have a car. According to Petitioner, Billie sold her a car. She said Billie asked if she would like to gamble with her in North Carolina and Petitioner agreed to do so. She said she and Billie met on the 4th of July weekend in 2000 and Billie's car was stolen. She said when the car was recovered it was damaged and Billie arranged to have her drive her to Michigan.

According to Petitioner, Billie told her that she and Donald had the perfect marriage

because he did not care how much money she spent or how much she stayed away from home. Petitioner said Billie and Donald argued about Billie's gambling debt.

Petitioner further testified that, on the weekend of July 11, 2000, Billie had to go to California because her son was in a serious car accident. According to Petitioner, Billie suggested that her husband take Petitioner out to dinner for her birthday. Petitioner said Donald drank before they went out. She said Donald kept his vodka in the freezer. During dinner, Donald drank more and then passed out.

Petitioner testified that she got Donald home and they went to their separate beds. However, sometime later when Petitioner woke up, Donald was in bed with her. Petitioner said Donald was grabbing her breasts. She asked Donald what he was doing and then told him that Billie would kill him if she caught him. She then went downstairs and slept on the couch.

Petitioner testified that, the following morning, Donald had a cut and bled extensively. Petitioner said that is when he got the black eye.

Petitioner testified that she and Billie went to Tennessee so Billie could get her car. Petitioner said she was going to stay in Tennessee even though she had met Chahine and liked him enough to want to continue their relationship. Petitioner said Billie was upset by that and wanted Petitioner to come back with her. Petitioner agreed to go back to Michigan with Billie.

According to Petitioner, Donald would make passes at her. She said she told Billie about what Donald was doing. Petitioner said Billie then caught Donald. Petitioner testified that Billie told Donald that he should be ashamed of himself and added, "[I]f you try to divorce me, . . . I'll have something on you." Trial Tr. vol. V, 109, Mar. 18, 2002.

Petitioner further testified that Donald would fall. He would say: "I think Billie put these

16

floors in here, she's trying to kill me." Trial Tr. vol. V, 110, Mar. 18, 2002. Billie responded: "[Y]eah, next time I'll just spend $25,000 and hire somebody." Trial Tr. vol. V, 110, 175, 188, Mar. 18, 2002. Petitioner said Donald drank every day and was visibly intoxicated.

Petitioner denied telling Chahine that Donald died happy because he played with her breasts. She said she told Chahine that he was a transsexual the first week she met him. She said Chahine took her to his jewelry store. He gave her a bracelet for her birthday and also gave her a ring, on the condition that she marry him. She said when they had sex, she was naked, but he never made any comments.

Petitioner testified that, on August 11, 2000, Chahine took her home after she spent the night at his house. She said she and Billie cleaned the house and Donald went to work, as he did every day. Donald would leave at 4 or 5 a.m. and come home at 3:30 or 4 p.m. Petitioner said Donald came home and ate that day. She said she did not eat because she had been drinking. She and the Rogers were supposed to go to the race track but did not because Donald was drunk.

Petitioner further testified that she and Billie were in the living room when they heard Donald fall. Petitioner said she went into the kitchen and found Donald passed out, with the chair on the floor. She said she then went to check on some pants she had in the dryer. She said when she came back she asked Billie about getting Donald up off of the floor. Billie told her to hold Donald's mouth and nose closed and he would wake up. She said she refused to do so. She said she thereafter agreed to hold Donald's mouth if Billie held his nose. Petitioner testified that she kept her fingers spread apart and thought that Billie was joking.

Petitioner said Billie grabbed a vodka bottle and poured some vodka in Donald's mouth.

She said Donald spit it out.  She told Billie to leave him alone, but Billie told her to pour the vodka down his mouth; she poured a little bit in his mouth.  She said Billie grabbed the bottle and poured vodka in Donald's nose; he shook his head.  She thought Billie was hurting Donald.  She took the bottle away and told Billie that she was hurting him and to stop wasting the vodka.

Petitioner testified that she made a drink, telling Billie that they should go to the casino and let Donald sleep until they got back.  According to Petitioner, she then went to the bathroom to get ready.  Petitioner said when she came back into the kitchen, she found Billie holding a pillow over Donald's face.  She said she told the police that the pillow was from a couch in the family room and that it had a rough texture.

Petitioner said she asked Billie, "[W]hat the fuck are you doing?"  Trial Tr. vol. V, 141, Mar.18, 2002.  According to Petitioner, Billie removed the pillow and said she had to do it because he would know what had happened earlier.  Petitioner denied holding Donald down.

Petitioner said she checked to see if Donald was breathing and told Billie that she was going to call 9-1-1.  Petitioner said Billie told her to calm down.  She said Billie offered her $25,000, but she declined.  Billie told her she would make it $50,000, but she still declined.

Billie told Petitioner if she called 9-1-1, she would tell the authorities that she had more to do with Donald's death.  Petitioner said she was afraid to call 9-1-1.

Petitioner testified that Billie told her that they would go to the casino and when they got back, Billie would then call 9-1-1 and tell them that they found Donald on the floor not breathing.  She denied asking Chahine to be her alibi.  She testified that Billie talked about it, but then decided that he (Chahine) would try to blackmail them.

Petitioner said she and Billie went to the casino and returned home at 3:30 a.m.  She said

Billie threw away the pillow, but she did not remember if she threw away the bottle. She could not recall if she told the police that she might have thrown out the pillow.

According to Petitioner, once home, Billie called 9-1-1. She admitted to being loud and aggressive with the police, because she was worried Billie would tell the police.

Petitioner testified that, after everyone left, Billie began yelling at her. She said she responded that she did not want to lie. Petitioner said Billie told her "[W]ell, why do you care? You're getting $50,000 for lying." Trial Tr. vol. V, 149, Mar.18, 2002. She told Billie that she did not want the money. Petitioner said she lied to the police, not for the money, but because she did not want to see Billie die in prison.

Petitioner testified that she was drinking heavily thereafter. She said she did not get out of bed for three days because she was praying, reading the Bible, and drinking.

Petitioner further testified that she first saw Chahine after he and Billie went to the Kingsley Inn. Petitioner said she went to a doctor, who prescribed an anti-anxiety drug. According to Petitioner, the doctor told Petitioner to stop drinking. Petitioner said, after she began taking the drug, she drank less because she was calmer.

Petitioner testified that she arranged to treat Chahine to dinner. She told him she had something important to tell him and that he thought she was going to accept his marriage proposal. Petitioner told Chahine that he could not legally marry her because she was a man. He was upset. Because he was so upset, Petitioner suggested they go and talk in the car. According to Petitioner, Chahine was more concerned that she was not going to marry him than anything else. She said she then went home with him and they had sex.

Petitioner testified that Billie got a room at the Kingsley Inn because she (Petitioner)

could not stand to be in the house.  Petitioner testified that she told Billie's daughter what had happened.  Billie's daughter told her that Billie would pay her $100,000 and she would have to keep her mouth shut.  She took the money and car so she could get away from Billie.

Petitioner testified that she told her mother what had happened.  Billie threatened Petitioner's mother, telling her that she would make sure that Petitioner got in trouble.  Billie added that she had money, so, she would not spend even one day in jail.

Petitioner said she gave most of the money away and never planned to use it for a sex-change operation.  She admitted she paid her bills with the money.  She also admitted she may have told the police that Billie gave her $10,000 in cash when she bought her Cadillac.

Detective Zimmerman was the prosecution's rebuttal witness.  He said Petitioner told the police that Billie had mentioned having Donald killed for $25,000.  In her statement to him, she said she told Billie about a hit man she knew in Denver, but it would cost more than $25,000.

Detective Zimmerman said Petitioner told the police that Billie offered her $25,000 before she poured the vodka in Donald's mouth.  Petitioner also told the police that Billie had made a motion indicating that she should smother Donald and that Billie said "do it."  Trial Tr. vol. V, 219, Mar. 18, 2002.

Petitioner told the police Billie had given her $10,000 in cash after the murder.  She said she got Billie to give her all the money after Billie had bought the Cadillac.  Petitioner told the police on a different occasion that it was her idea to wake up Donald by holding his nose.

The jury found Petitioner guilty.

On May 14, 2002, Petitioner filed her direct appeal with the Michigan Court of Appeals.

On November 21, 2002, she filed a motion for remand, which was denied in an order dated January 9, 2003. *People v. Titlow*, No. 241285 (Mich.Ct.App. Jan. 9, 2003).

On November 25, 2002, Petitioner filed her brief with the Court of Appeals raising the following claims: (1) trial counsel was ineffective in advising her to withdraw her guilty plea to manslaughter, in failing to impeach the prosecution's star witness, in failing to object to prosecutorial misconduct, and in failing to object to the jury instructions and asking for an abandonment instruction; (2) prosecutorial misconduct, where the prosecutor vouched for the credibility of a witness, shifted the burden of proof, denigrated counsel, violated her right to remain silent, argued facts not in evidence, and pursued her prosecution knowing that she passed a polygraph test; (3) the jury was improperly instructed; and (4) cumulative errors.

In an unpublished opinion, dated December 11, 2003, the Court of Appeals affirmed Petitioner's conviction and sentence. *People v. Titlow*, No. 241285, 2003 WL 22928815 (Mich.Ct.App. Dec. 11, 2003).

Petitioner then filed an application for leave to appeal that decision with the Michigan Supreme Court, raising the same claims. On May 28, 2004, the Michigan Supreme Court denied Petitioner's application. *People v. Titlow*, 470 Mich. 867, 680 N.W.2d 900 (2004).

On August 22, 2005, Petitioner filed a motion for relief from judgment, under Mich.Ct.R. 6.500 *et. seq.*, with the trial court. In that motion, Petitioner raised the following claims:

I. [Petitioner's] sentence is unconstitutional under the United States Supreme Court's decisions of *Blakely v. Washington*, 542 U.S. 296 (2004) and *United States v. Booker*, 543 U.S. 220 (2005) and a resentencing is required.

II. [Petitioner] was denied a fair trial and due process of law where (a) the state trial court, over objection, gave the jury the option to convict [Petitioner] under a second-degree murder theory that "inaction or

non-action to stop or prevent a crime" constitutes second-degree murder where such a verdict impermissible as that crime is defined under Michigan law; and (b) the jury option of finding guilt under a [sic] "inaction or non-action" theory shifted the burden of proof.

III.     [Petitioner] was denied a fair trial and due process of law where there was insufficient evidence to show that she knowingly failed to act to stop or prevent the homicide with knowledge that death or great bodily harm would follow her failure to act to stop or prevent the crime and the remedy is to reduce the charge to accessory after the fact to second-degree murder.

IV.     [Petitioner] Titlow was denied the effective assistance of counsel at trial.

V.     ]Petitioner] Titlow was denied effective assistance of appellate counsel and counsel's performance establishes good cause for bringing the post-appeal motion for relief from judgment.

In an order entered on November 9, 2005, the trial court denied Petitioner's motion.

*People v. Titlow*, No. 01-177745-FC (Oakland County Circuit Court, Nov. 9, 2005).

Petitioner filed an application for leave to appeal the trial court's decision with the Michigan Court of Appeals, raising the same claims raised in her motion for relief from judgment. The application was denied because she "failed to meet the burden of establishing relief under MCR 6.508(D)." *People v. Titlow*, No. 273274 (Mich.Ct.App. Apr. 27, 2007). Petitioner filed an application for leave to appeal that decision with the Michigan Supreme Court, which was denied for the same reason. *People v. Titlow*, 480 Mich. 890, 738 N.W.2d 715 (2007).

Petitioner filed the pending habeas action with this Court on August 28, 2007.

## III.     STANDARD OF REVIEW

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") governs this Court's habeas review of state-court decisions. Under the AEDPA, a federal court's review of a habeas proceeding is limited. A federal court may not grant a writ of habeas corpus unless the

state adjudication on the merits either:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented at the State court proceedings.

28 U.S.C. § 2254(d).

The Supreme Court clarified that standard in *Williams v. Taylor*, 529 U.S. 362, 412-13

(2000):

> Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this Court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts. Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

With that standard in mind, the Court proceeds to address Petitioner's claims.

## IV. DISCUSSION

### A. Ineffective Assistance of Counsel Regarding Guilty Plea and Media Rights

In her first habeas issue, Petitioner argues that she was denied the effective assistance of counsel when her second attorney recommended that she withdraw her guilty plea to manslaughter, which resulted in a trial verdict on the higher offense of second-degree murder. She also argues that the attorney had a conflict of interest when rendering that advice because his law firm had obtained the media rights to her story.

The Michigan Court of Appeals, in addressing these issues, stated:

A. Withdrawal of Guilty Plea

When a defendant pleads guilty, he must be prepared to admit the

elements of the offense. The record discloses that the second attorney's advice was set in motion by defendant's statement to a sheriff's deputy that he did not commit the offense. Defendant offers the affidavit of his first attorney, who negotiated a plea agreement that he thought was in defendant's best interests. When a defendant proclaims his innocence, however, it is not objectively unreasonable to recommend that the defendant refrain from pleading guilty–no matter how "good" the deal may appear. We therefore reject defendant's argument that his second attorney gave him "grossly erroneous advice." On the proofs and arguments offered by defendant, defendant has failed to demonstrate that his second attorney's advice to withdraw his plea fell below an objective standard of reasonableness.

B. Conflict of Interest

We now turn to defendant's allegation that his second attorney acquired an improper interest under MRPC 1.8. Although the type of memorable or "juicy" story that sells books or movies may conflict with a defendant's best interests at trial, in this case defendant's second attorney withdrew before any harm could potentially be done. Defendant has not demonstrated that any impropriety by counsel deprived him of the effective assistance of counsel.

*Titlow*, 2003 WL 22928815, at * 2 (footnotes and citations omitted).

Petitioner has not shown that the Michigan Court of Appeals's decision regarding this claim is contrary to, or an unreasonable application of, clearly established federal law as determined by the Supreme Court or an unreasonable determination of the facts. Rather, she simply reargues the claims made before the Court of Appeals and states in conclusory fashion that the state court's ruling was contrary to, or an unreasonable application of, Supreme Court precedent. The function of this Court on habeas review is not to act as if it were an appellate court reviewing the actions of the trial court on direct appeal. Rather, the function of this Court on habeas review is much more limited and, at the same time, much more deferential.

First, in order to establish ineffective assistance of counsel, it must be shown that counsel's performance was deficient and that the deficient performance prejudiced the defense so as to render the trial unfair and the result unreliable. *Strickland v. Washington*, 466 U.S. 668,

24

687 (1984).

With respect to the performance prong of the *Strickland* test, a petitioner must identify

acts that were "outside the wide range of professionally competent assistance" in order to prove

deficient performance. *Strickland*, 466 U.S. at 690. The reviewing court's scrutiny of counsel's

performance is highly deferential. *Id.* at 689. The court must recognize that counsel is strongly

presumed to have rendered adequate assistance and made all significant decisions in the exercise

of reasonable professional judgment. *Id.* at 690.

To satisfy the prejudice prong under *Strickland*, a petitioner must show that "there is a

reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding

would have been different." *Strickland*, 466 U.S. at 694. A reasonable probability is one that is

sufficient to undermine confidence in the outcome. *Id.* "On balance, the benchmark for judging

any claim of ineffectiveness must be whether counsel's conduct so undermined the proper

functioning of the adversarial process that the [proceeding] cannot be relied on as having

produced a just result." *McQueen v. Scroggy*, 99 F.3d 1302, 1311-12 (6th Cir. 1996) (quoting

*Strickland*, 466 U.S. at 686). *See also Wickline v. Marshall*, 319 F.3d 813, 819 (6th Cir. 2003),

*cert. denied*, 540 U.S. 955 (2003).

Here, the Michigan Court of Appeals applied *Strickland* to the facts of this case.

Petitioner may not agree with how the Court of Appeals did so, but mere disagreement with the

state court's analysis is not sufficient to warrant habeas relief. As for its factual determinations

(i.e. "the second attorney's advice was set in motion by defendant's statement to a sheriff's

deputy that [s]he did not commit the offense"), Petitioner has not overcome the presumption of

correctness of such factual determinations.

The Court of Appeals's finding that "interim counsel" was not ineffective is completely reasonable on the law and the facts. Counsel could not be ineffective by trying to negotiate a better plea agreement for Petitioner with Billie Rogers's trial imminent and Petitioner stating at the time that Billie Rogers had committed the murder without her assistance (in other words, that she was innocent). The related assertion that "interim counsel" was motivated by a fee agreement that involved counsel's acquisition of a book or media rights (something that interim counsel himself denied), does not per se render counsel ineffective. *Beets v. Collins*, 65 F.3d 1258, 1272-1273 (5th Cir. 1995), *cert. denied*, 517 U.S. 1157 (1996).

The Petitioner's desire to withdraw her plea (which itself was motivated by a belief in innocence) pre-dated interim counsel's involvement. Moreover, how can a criminal defendant's counsel be ineffective for advising her to go to trial when she (the criminal defendant) claims to be innocent of the crime? Petitioner chose to go to trial and to take her chances with a jury. A jury convicted Petitioner of a charge greater than manslaughter, but lesser than first-degree murder. She may now regret that choice, but it is not a basis for granting federal-habeas relief.

Petitioner claims that due process is implicated herein by noting that the sheriff's deputy who stated that she should withdraw her plea was a state actor and because "interim counsel" was an officer of the court and, therefore, also acting on behalf of the state. That claim was reasonably rejected by the Court of Appeals. Petitioner has not shown that a contrary conclusion is compelled by Supreme Court precedent.

Against that backdrop, the Court concludes that Petitioner is not entitled to habeas relief

26

regarding these claims.

**B.**      **Remaining Ineffective Assistance of Counsel Claims**

Petitioner also alleges that she was denied her right to the effective assistance of counsel

where counsel (1) failed to impeach the prosecution's star witness on material points, (2) brought

out evidence which attacked her character, (3) failed to object to a jury instruction, and (4)

failed to ask for an abandonment instruction.

The Michigan Court of Appeals also rejected these claims, stating:

> A.  Eliciting Damaging Testimony/Failure to Impeach
>
> Defendant argues that trial counsel was ineffective when he elicited damaging information from the prosecution's main witness, Danny Chahine, and then failed to impeach Chahine with prior statements contradicting the damaging version.  The failure to call witnesses or present other evidence can constitute ineffective assistance of counsel only when it deprives the defendant of a substantial defense.  A substantial defense is one which might have made a difference in the outcome of the trial.
>
> During cross-examination of Chahine, counsel asked about defendant's statements describing how Donald was killed.  Chahine had earlier testified that defendant put his hand over Donald's mouth, but kept a passage open so Donald could breathe.  Meanwhile, Billie Rogers was offering increasing sums of money for defendant's cooperation, from $25,000 to $50,000.  Counsel asked Chahine about defendant's actions as Billie went for a pillow to suffocate her husband:
>
>> Q.  But after you indicate that Billie is becoming frustrated and she makes the statement from 25 to $50,000, you never hear Nicole make another statement that she put his-her hand back over Don Rogers'[s] mouth?
>>
>> A.  No.
>>
>> Q.  You didn't hear a statement that [defendant] held him down so that the pillow could be placed over his head?
>>
>> A.  I did hear a statement like that.

Q. You did hear that statement?

A. Yes.

Q. What statement did you hear?

A. Billie asked her to help pin him down, so that she could put the pillow on his head.

As a result of this damaging testimony, defendant argues, counsel abandoned a "mere presence" defense, which had earlier been argued in opening statements. Defendant argues that counsel should have impeached Chahine with three prior statements denying that defendant was involved in the smothering of Donald. Those prior statements consisted of the following:

(1) A videotaped interview of Chahine by a police detective, in which Chahine stated that defendant did not say what he was doing at the time Donald was smothered;

(2) Chahine's testimony at Billie Rogers'[s] trial, in which he testified that defendant "did not tell me . . . if she did help her with the pillow or not;" and

(3) Chahine's testimony at the preliminary examination in this matter, in which he testified that defendant told him that he stood back and did not help smother the victim.

Defendant's argument is based on several assumptions. First, he assumes that there was a discrepancy between the trial testimony and the prior versions of the events. At trial, defense counsel finished his cross-examination of Chahine with a clarification that changed the character of the allegation:

Q. And at no time during the conversation [with police] did you tell Detective Tullock that while the pillow [w]as over, Nicole also indicated to you she was holding him down?

A. No. She was holding her [sic] down during some period of time. I don't remember if while the pillow was in his face. All I remember is that Billie asked Nicole to help her pin him down.

Q. So it could have been during the time that they were pouring alcohol down his throat?

A. It could have been.

Because counsel succeeded in getting Chahine to concede that his impression may have been inaccurate, we cannot say that defendant was prejudiced by counsel's failure to impeach him further.

Second, defendant assumes that defense counsel was aware of the materials containing the witness' prior statements. Defendant asserts that certain statements are contained in a transcript of Chahine's videotaped interview with the police, yet he concedes that trial counsel did not have the transcript. Instead, counsel had a copy of the videotape, which may or may not have been intelligible. Defendant also has not shown that trial counsel had a copy of Chahine's testimony from Billie Rogers'[s] trial. Indeed, it was defendant's financial inability to pay for that transcript that led his second attorney to withdraw from the case.

Third, defendant assumes that the "mere presence" theory was abandoned as a result. In fact, during opening statement defense counsel raised several potential defenses, including abandonment, mere presence, and inconsistencies between medical reports and prosecution witnesses' versions of the events. During closing argument, counsel argued that defendant abandoned the endeavor, and was shocked to return and find that Billie Rogers had suffocated her husband. There is nothing in the record to indicate that counsel failed to argue a "mere presence" defense in closing because of the way Chahine testified. We may not presume that counsel was ineffective. Indeed, it is possible that counsel declined to argue a "mere presence" defense because it would have diminished the credibility of defendant's version, in which defendant claimed that he was not present when his aunt suffocated the victim.

## B. Evidence Attacking Defendant's Character

Defense counsel elicited testimony from defendant that he had worked as an escort, but was not involved in prostitution. This opened the door for the prosecutor to ask about a pending prostitution charge against defendant. On appeal, defendant argues that counsel was ineffective for bringing out such "lifestyle" evidence rather than focusing on guilt or innocence. We disagree. Defendant had testified that he made a lot of money by running an escort service and had a boyfriend who would have paid for the $10,000 sex[-]change operation. Although motive is not strictly an element of an offense, it is always relevant. The concession of sordid details about defendant's lifestyle could have negated any financial motive, and also could have created an atmosphere of candor– especially since, as defendant argues on appeal, he made no effort to hide his sexuality from the jury. Defendant has failed to overcome the strong presumption that counsel engaged in sound trial strategy. As for the evidence that defendant was currently charged with prostitution, defendant has not shown that counsel

29

was aware of that charge.

### C. Failure to Impeach Witness

During trial, Chahine testified that defendant did not drink much. Defendant argues that this contradicted a planned intoxication defense. Defendant argues that Chahine should have been impeached with prior statements made to the police about defendant's excessive drinking. Again, however, the record does not demonstrate, nor has defendant shown, that counsel was aware of the prior statements. Additionally, even if counsel was aware of the statements, defendant has not shown why counsel decided not to impeach the witness with those statements.

### D. Jury Instructions and Deliberations

Defendant argues that trial counsel was ineffective for failing to request a jury instruction on the defense of abandonment, and for failing to object to the court's response to a jury note during deliberations.

Defendant has failed to identify the specific instruction he claims counsel should have requested, thereby precluding a determination whether the desired instruction would have accurately stated the law. To the extent defendant suggests that counsel should have requested CJI2d 9.4, we find no error. That instruction would have implied that defendant intended to commit the offense at one time, but "freely and completely gave up the idea of committing the crime." The instruction would have contradicted defendant's assertion that he thought Billie Rogers was joking, and was surprised to find her suffocating her husband.

Regarding the trial court's response to the jury's note, because we conclude in part VI, *infra*, that the court did not err in its response to the jury, we conclude that counsel did not err by failing to object.

### E. Failure to Object to Prosecutor's Conduct

Defendant also argues that trial counsel was ineffective for failing to object to the prosecutor's arguments and tactics discussed in part IV, *infra*. Because we find no error in the prosecutor's arguments, defendant has not shown that counsel was ineffective for failing to object.

*Titlow*, 2003 WL 22928815, at *3-5 (citations and footnotes omitted).

The Michigan Court of Appeals correctly analyzed Petitioner's claim of ineffective assistance of counsel using the two-pronged test enunciated federally in *Strickland*. As the Supreme Court noted:

> Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy.

*Strickland*, 466 U.S. at 689.

Obviously, this does not mean that a trial counsel's tactical decisions are completely immune from Sixth Amendment review. However, they must be particularly egregious before they will provide a basis for relief. *Martin v. Rose*, 744 F.2d 1245, 1249 (6th Cir. 1984). It appears to the Court that Petitioner is nitpicking at the actions of trial counsel. For example, on page twenty-nine of the brief, she states "[w]hile Petitioner admits that her counsel did impeach the witness during cross examination, the impeachment was on completely irrelevant points." On page thirty-three of the brief, Petitioner argues that there were more effective ways of demonstrating that she had no monetary motive for committing the crime other than having her admit that she was an escort. Those are disagreements with trial strategy and are not reasons for granting habeas relief.

Petitioner's claims regarding her trial counsel "largely miss the point: just as (or more)

important as what the lawyer missed is what he did not miss.  That is, we focus on the adequacy or inadequacy of counsel's (hindsight) potential for improvement.  Furthermore, our review is highly deferential." *Coe v. Bell*, 161 F.3d 320, 342 (6th Cir. 1998), *cert. denied*, 528 U.S. 842 (1999) (internal citation omitted).

Moreover, several claims are not entitled to review.  Petitioner's claim that trial counsel was ineffective for failing to request a jury instruction on defense of abandonment was essentially procedurally defaulted by the Court of Appeals when it found that "Defendant has failed to identify the specific instruction he claims counsel should have requested, thereby precluding a determination whether the desired instruction would have accurately stated the law." *Titlow*, 2003 WL 22928815, at *5.  The fact that the Court of Appeals did analyze Petitioner's contention that counsel should have requested the desired instruction, in the alternative, does not waive the default, *see Pearl v. Cason*, 219 F.Supp.2d 820, 828 (E.D. Mich. 2003) (citing *Paprocki v. Foltz*, 869 F.2d 281, 285 (6th Cir. 1989), and *McBee v. Abramajtys*, 929 F.2d 264, 267 (6th Cir. 1991)).

Petitioner apparently does not realize that she has procedurally defaulted this claim. Therefore, she does not attempt to show cause for the default.  Because she has failed to establish cause to excuse the default, there is no need to address the prejudice prong.  *See Smith v. Murray*, 477 U.S. 527, 533 (1986), *Long v. McKeen*, 722 F.2d 286, 289 (6th Cir. 1983), *cert. denied*, 465 U.S. 1106 (1984).

Furthermore, Petitioner's claims of ineffective assistance of counsel relating to the trial court's response to the jury's question during deliberations and to the purported failure to object

to prosecutorial misconduct are simply without merit because the underlying claims (concerning the jury question and the conduct of the prosecutor) are without merit. As noted by the Sixth Circuit Court of Appeals in *Durr v. Mitchell*, 487 F.3d 423, 439 (6th Cir. 2007), "[i]n a trial of any size, numerous potentially objectionable events occur" and, quoting *Engle v. Isaac*, 456 U.S. 107. 134 (1982), added that, "the Constitution does not insure that defense counsel will recognize and raise every conceivable constitutional claim." The Sixth Circuit further noted that, it is only where, "defense counsel . . . consistently fail[s] to use objections, despite numerous and clear reasons for doing so, that counsel's failure cannot reasonably be said to have been part of a

trial strategy or tactical choice." *Durr*, 487 F.3d at 439 (quoting *Lundgren v. Mitchell*, 440 F.3d 754, 774-775 (6th Cir. 2006)).

Petitioner simply disagrees with how the Court of Appeals resolved her claims of ineffective assistance of trial counsel on direct appeal. However, the Court concludes that the Court of Appeals used the correct standard for judging a claim of ineffective assistance of counsel. Therefore, Petitioner cannot claim that the Court of Appeals's ruling is contrary to, or an unreasonable application of, clearly established Supreme Court precedent. The Court finds that Petitioner is not entitled to habeas relief regarding her remaining ineffective-assistance-of-counsel claims.

### C.     Prosecutorial Misconduct Claims

In her next habeas claim, Petitioner argues that she was denied her rights to due process and a fair trial by multiple instances of prosecutorial misconduct.

"When a petitioner makes a claim of prosecutorial misconduct, 'the touchstone of due

process analysis . . . is the fairness of the trial, not the culpability of the prosecutor." *Serra v. Michigan Dep't. of Corrs.*, 4 F.3d 1348, 1355-1356 (6th Cir. 1993), *cert. denied*, 510 U.S. 1201 (1994) (quoting *Smith v. Phillips*, 455 U.S. 209, 219 (1982)). On habeas review, the role of the federal court is to determine whether the conduct was "so egregious as to render the entire trial fundamentally unfair." *Serra*, 4 F.3d at 1355 (*Cook v. Bordenkircher*, 602 F.2d 117, 119 (6th Cir. 1999), *cert. denied*, 444 U.S. 936 (1979)). "[T]he misconduct must be so pronounced and persistent that it permeates the entire atmosphere of the trial or so gross as probably to prejudice the defendant." *Mason v. Mitchell*, 320 F.3d 604, 635 (6th Cir. 2003) (quoting *Simpson v. Jones*, 238 F.3d 399, 409 (6th Cir. 2000) (internal quotation marks and citation omitted)). The Sixth Circuit in *Serra* set out the following test to determine if fundamental fairness results from prosecutorial misconduct:

> In every case, we consider the degree to which the remarks complained of have a tendency to mislead the jury and to prejudice the accused; whether they are isolated or extensive; whether they were deliberately or accidentally placed before the jury, and the strength of the competent proof to establish the guilt of the accused.

*Serra*, F.3d at 1355-1356.

It is important to note that "[c]laims of prosecutorial misconduct are reviewed deferentially on habeas review." *Millender v. Adams*, 376 F.3d 520, 528 (6th Cir. 2004), *cert. denied*, 544 U.S. 921 (2005).

In its opinion, the Michigan Court of Appeals rejected Petitioner's claim of prosecutorial misconduct as follows:

### A. Vouching for Credibility and Allowing Perjury

> Defendant argues that the prosecutor vouched for the credibility of its primary witness and failed to disclose that perjury was being committed. In

addressing comparisons between Chahine's statements to the police during the investigation, and Chahine's testimony given at trial, the prosecutor asked the officer-in-charge whether the versions were consistent:

> Q. Now, the information that – you heard what Mr. Chahine's testimony was over the last two days in Court, did you not?
>
> A. Yes.
>
> Q. Is that the information that he related to you at the police station in Troy on August the 30th?
>
> A. Generally, yes.

Defendant argues that this questioning violated his right to due process for three reasons: (1) the prosecutor failed to disclose that Chahine was lying when he implicated defendant; (2) the prosecutor failed to disclose that the officer was lying when he said that Chahine's testimony was consistent with prior statements; and (3) the prosecutor vouched for Chahine's credibility via the officer's testimony. We disagree. Defendant has not shown that any witness committed perjury. Defendant reads too much into the officer's brief response, in which the officer qualified his answer using the word "generally." The officer's testimony may be equally interpreted as conveying that Chahine was presenting a somewhat different story in court because his testimony was only "generally" the same as information given at the police station. While a prosecutor may not ask a witness to comment on the credibility of other witnesses, he may attempt to ascertain which facts are in dispute.

Defendant also argues that the prosecutor vouched for the credibility of his witnesses when he stated several times in closing argument that "we know" certain facts, and "that's what happened" and "that was the truth." Again, defendant reads these statements too broadly. Viewed in context, they constituted proper comment on the evidence, and did not suggest that the government had some special knowledge about the facts.

### B. Shifting the Burden of Proof and Denigrating Defense Counsel

During closing argument, the prosecutor addressed the differing points of view about which evidentiary matters were the most significant:

> The medical testimony in this case is not the crux of this case. This is the crux of tis [sic] case, and Mr. Cataldo [defense counsel] did not address this. Mr. Cataldo ran from this. There's

an old saying in the law is [sic] that when you have the facts on your side, you pound on the facts. And when you have the law on your side, you pound on the law. And when you have neither the law nor the facts on your side, you pound on the table. That's what's going on here. This was not addressed. Mr. Cataldo says that we have to look at the medical testimony and I say look at the tape [in which defendant expressed remorse for killing Rogers].

Defendant argues that these remarks improperly implied that defense counsel had a duty to address certain facts, and denigrated defense counsel by implying that he was trying to mislead the jury. Viewed in context, however, we believe the remarks reflect a proper attempt to distinguish the different points of view urged by both sides in this case.

### C. Right to Remain Silent

Next, defendant argues that the prosecutor improperly commented upon his right to remain silent when he asked the arresting officer about statements defendant made upon his arrest in Chicago. The officer testified that he and his partner went to defendant's apartment and informed him that they had a warrant for the murder of Donald Rogers.

A. At this time, M[s]. Titlow, spontaneously stated, where's my aunt? Is my aunt under arrest too? At that time, we stopped her and advised her – advised [her] of his rights and there was no further talking to her.

Q. Okay. And you had not asked any questions prior to Titlow making that statement, had you?

A. No, sir.

Q. You said a spontaneous utterance?

A. Yes, sir.

Q. Alright. And then after [s]he said that, you advised [her] of [her] rights?

A. Yes, I did[.]

Q. But what [s]he said was, where's my aunt? Has she been arrested too?

Q. Yes, sir.

Q. Any other comment about why you were arresting [her] or anything like that?

A. No, sir.

Q. Just where's my aunt?

A. Is she under arrest too.

Evidence that a defendant made a statement and said nothing further does not denigrate the defendant's exercise of the right to remain silent. This isolated reference was not used to impeach defendant or to support the prosecutor's theory that defendant committed the offense and, therefore, does not support a claim of misconduct.

### D. "Improper" Questioning of Defendant

Defendant argues that the prosecutor erred by asking about prior arrests not leading to convictions, defendant's sex life and preferences, and financial matters. The defense opened the door to these matters. The prosecutor did not err by asking follow-up questions testing the veracity of defendant's testimony.

### E. Arguing Facts Not in Evidence

Finally, defendant argues that the prosecutor argued facts not in evidence when he misquoted Chahine in closing argument by stating that defendant told Chahine, "I don't know why I did it. I don't know why I held Don down while Billie smothered him. These are her words . . . two weeks after the murder." Defendant argues that he never made such a statement to Chahine. We find no error in the prosecutor's attempt to translate Chahine's testimony about defendant's statements into a first-person account by defendant. The gist of the allegations are the same: that defendant told Chahine that he did not know why he participated, and that he held the victim down. Although Chahine later distanced himself from the certainty of this testimony, the prosecutor was free to argue the inference that defendant held Donald Rogers down during the suffocation and not merely while Billie poured liquor down his throat.

*Titlow*, 2003 WL 22928815, at * 6-7 (citations and footnotes omitted)..

It appears that the Court of Appeals may have procedurally defaulted Petitioner's claims

of prosecutorial misconduct. In discussing Petitioner's claims of ineffective assistance of counsel, it noted that Petitioner "also argues that trial counsel was ineffective for failing to object to the prosecutor's arguments and tactics discussed in part IV, *infra*." *Titlow*, 2003 WL 22928815, at * 5. The Court of Appeals states "[b]ecause we find no error in the prosecutor's arguments, defendant has not shown that counsel was ineffective for failing to object." *Id.* That appears to be an assertion that the claims were reviewed for plain error and, therefore, were procedurally defaulted.

While the Court of Appeals appears to discuss the merits of the claims of prosecutorial misconduct, it is only does so only in the context of a plain-error review. That does not change the fact that the claims were procedurally defaulted. Plain-error review, although involving some discussion of the "merits" of the claims presented by Petitioner, is in fact not a review on the merits. It is the opposite of review on the merits. Rather, it is a reflection of the Court of Appeals "actually enforcing" the state procedural default. In other words, as the Sixth Circuit has found, "plain error" review does not constitute a waiver of state procedural rules. *Lundgren*, 440 F.3d at 765 ("Plain[-]error analysis is more properly viewed as a court's right to overlook procedural defects to prevent manifest injustice, but is not equivalent to a review of the merits" (emphasis added)); *White v. Mitchell*, 431 F.3d 517, 525 (6th Cir. 2005), *cert. denied*, 549 U.S. 1034 (2006); *Hinkle v. Randle*, 271 F.3d 239, 244 (6th Cir. 2001).

In any case, the claims do not merit habeas relief. For example, while Petitioner argues that the prosecutor improperly vouched for Chahine, because the fairness of the trial, not the culpability of the prosecutor is the touchstone of a due process analysis, federal habeas relief is not appropriate for purported improper vouching by a prosecutor. *Byrd v. Collins*, 209 F.3d

486, 537 (6th Cir. 2000), *cert. denied*, 531 U.S. 1082 (2001). As was noted in *Byrd*, while such relief might rarely be appropriate in the context of a direct appeal where a federal court would exercise supervisory control over a federal trial court proceeding, *id*, such is obviously not the situation in federal-habeas proceedings arising out of a state-court conviction, where the issue is being raised collaterally and where deference to the state-court rulings must be given.

Petitioner also claims that the prosecutor engaged in misconduct when he failed to disclose that Chahine and a police officer were lying on the stand (this claim is phrased in terms of failure to disclose exculpatory evidence and failure to advise counsel and the court of false testimony). The Court of Appeals found that Petitioner "has not shown that any witness committed perjury" and that many of Petitioner's claims were based on her reading statements of witnesses and the prosecutor himself "too broadly." *Titlow*, 2003 WL 22928815, at * 6.

Because Petitioner failed to rebut the presumption of correctness accompanying these factual findings by the Court of Appeals, this Court finds that the Court of Appeals's rejection of these claims was not unreasonable or contrary to clearly established Supreme Court precedent.

Other claims of prosecutorial misconduct by Petitioner were rejected by the Court of Appeals on very fact-specific grounds such as its own review of the comments or the questions in context (i.e. a determination by the Court of Appeals that a comment was "isolated", that "the defense opened the door" to the subjects at issue, that the prosecutor did not refer to Petitioner's right to silence because "[e]vidence that a defendant made a statement and said nothing further does not denigrate the defendant's exercise of the right to remain silence"). Those factual assertions in particular are entitled to great deference. In addition, the Court of Appeals referenced the trial court's instruction to the jury that the arguments of counsel are not evidence

(especially to Petitioner's claim that he misquoted him during closing argument).  Such limiting instructions have been held to prevent due process violations from occurring due to purported prosecutorial misconduct, especially when it occurs during closing argument.  *Gillard v. Mitchell*, 445 F.3d 883, 898 (6th Cir. 2006), *cert. denied*, 549 U.S. 1264 (2007).

Against that backdrop, the Court concludes that Petitioner is not entitled to habeas relief regarding these prosecutorial-misconduct claims.

### D.       Prosecutorial Vindictiveness Claim

In her next habeas claim, Petitioner argues that she was denied due process because the charge of first-degree murder was a result of prosecutorial vindictiveness.

The Michigan Court of Appeals, in addressing, and rejecting, this claim, stated:

> Defendant argues that his due process rights were violated when the prosecutor continued to prosecute him, despite "knowing" that he did not commit the charged offense, knew that he had "passed" a polygraph examination, and had expressed satisfaction with the plea agreement that would have resulted in a manslaughter conviction.

> The authority to prosecute for violation of state law is vested solely and exclusively with the prosecuting attorney.  A trial court's authority over the discharge of the prosecutor's duties is limited to those activities or decisions by the prosecutor that are unconstitutional, illegal, or ultra vires.  A decision to dismiss a case or proceed to trial ultimately rests in the sole discretion of the prosecutor.  Absent some reason to conclude that the prosecutor's acts are unconstitutional, illegal, or ultra vires, the prosecutor's decision whether to proceed with a case is exempt from judicial review.  If, however, a prosecutor continues to pursue charges knowing that a defendant is not guilty, the prosecutor would be committing an unconstitutional, illegal, or ultra vires act.

> Here, defendant has not shown that the prosecutor "knew" that he did not commit the offense.  We may not infer that the prosecutor "knew" that defendant did not commit the offense from the polygraph results or from the prosecutor's willingness to negotiate a guilty plea to a lesser offense.  The shortcomings of polygraph examinations are well known.  Defendant deluded himself into believing that he was a woman, and the results of the polygraph examination could also have been delusional and, therefore, unreliable.

*Titlow*, 2003 WL 22928815, at 8.

Petitioner has not shown that the Court of Appeals's finding that the prosecutor was not vindictive in this matter is unreasonable. As noted by the Court of Appeals, the mere fact that a prosecutor engages in plea negotiations with a criminal defendant and allows him to plead to a lesser charge does not mean that he believes him to be innocent of the higher charge, such that subsequent reinstatement of the higher charge, when the defendant chooses to withdraw from the plea agreement, would be vindictive per se. Further, on the unique facts of this case, Petitioner "passing" a polygraph examination, as found by the Court of Appeals, is indicative only of Petitioner's unusual state of mind and nothing more.

Petitioner is denied habeas relief on this claim.

### E.     Jury Question Claim

In her next habeas claim, Petitioner argues that she was denied due process and her right to a properly instructed jury when the trial court failed to respond to a deliberating jury's question of law. The Michigan Court of Appeals rejected this claim, stating:

> Defendant argues that the trial court erred by failing to respond when the jury asked a question during deliberations. The jury's note inquired about the "malice" element of second degree murder:
>
>> Does someone's inaction, non-action to stop or prevent a crime resulting in death amount to fulfillment of condition three, second degree murder, knowingly creating a high risk of death, knowing that death would likely be the result of his actions?
>
> The trial court responded, "This is a question that is up to you to decide an answer." Neither party objected on the record.
>
> We find no error in the trial court's response, and therefore no prejudice from defense counsel's failure to object. First, we disagree with defendant's claim that the trial court failed to respond to the jury's question. The court responded by instructing the jury that "[t]his is a question that is up to you to

41

decide an answer." Second, we conclude that the trial court's response was not erroneous. Defendant essentially seeks a ruling that, as a matter of law, inaction can never satisfy the malice requirement of second-degree murder. Defendant cites no authority in support of this proposition. In any event, the trial court separately instructed the jury on the elements of aiding and abetting, explaining that, in order to convict defendant of aiding and abetting murder, it was required to find that he "did something to assist in the commission of the crime," and that he "must have intended the commission of the crime alleged or must have known the other person intended its commission at the time of giving the assistance." Additionally, the court instructed the jury:

> It doesn't matter how much help, advice or encouragement the Defendant gave. However, you must decide whether he intended to help another commit the crime and whether his advice, help or encouragement actually did help, advise or encourage the crime. Even if the Defendant knew that the alleged crime was planned or being committed, the mere fact that he was present when it was committed was not enough to prove that he assisted in committing it.

> Thus, the jury was properly instructed that it could not convict defendant unless it found that he actually intended and assisted in the commission of the crime.

> The jury's note was not directed at the court's aiding and abetting instruction, but at the intent element of second-degree murder. In this regard, the court did not err by instructing that this fact-intensive consideration was a matter for the jury to decide. The court's response did nothing to undercut the court's earlier instructions whereby the jury was told that it could not convict defendant of aiding and abetting a commission of the crime. Viewed as a whole, the court's instructions were not improper.

*Titlow*, 2003 WL 22928815, at * 8-9.

Again, it appears that the Court of Appeals procedurally defaulted Petitioner's jury question claim. *See* Discussion IV-C. The Court of Appeals noted that neither party objected on the record to the trial court's response to the question and stated that, "[a]s a court of review, we must have a record to review." *Titlow*, 2003 WL 22928815, at * 8, n. 10. The manner in which the Court of Appeals proceeds to address the claim, again, indicates a plain-error type of review

in the absence of an objection and a record of an objection.

Because Petitioner asserts that her claim was preserved for state court appellate review by a purported "off the record" objection (an assertion rejected by the Michigan Court of Appeals), she does not believe that she has procedurally defaulted this claim, and therefore does not attempt to show cause for the default. As Petitioner has failed to establish cause to excuse the default, there is no need to address the prejudice prong. *Smith*, 477 U.S. at 533, *Long*, 722 F.2d at 289.

In the alternative, Petitioner has not shown that the Michigan Court of Appeals's ruling on her jury question claim is contrary to, or an unreasonable application of, clearly established federal law as determined by the Supreme Court or an unreasonable determination of the facts. To the extent that the analysis undertaken by the Court of Appeals involves an interpretation or a discussion of the elements of the state law offense of second-degree murder and the state law concept of aiding and abetting, those are state-law matters and are not cognizable in federal-habeas review. *See Walker v. Engle*, 703 F.2d 959, 962 (6th Cir. 1983), *cert. denied*, 464 U.S. 951 (1983). Petitioner is therefore not entitled to habeas review on these claims.

### F.    Remaining Claims

Petitioner's remaining claims VI-X (I-V of her "amendment" to her brief) were presented in her motion for relief from judgment in the state courts under Mich.Ct.R. 6.500 and were procedurally defaulted by the state courts. The Michigan Supreme Court (as well as the Michigan Court of Appeals) denied Petitioner relief with respect to those claims by stating that the appeal was denied "for failure of the defendant to meet the burden of establishing entitlement to relief under MCR 6.508(D)." *People v. Titlow*, No. 273274 (Mich.Ct.App. Apr. 27, 2007);

*People v. Titlow*, 480 Mich. 890, 738 N.W.2d 715 (2007). And, Petitioner has failed to establish good cause and prejudice so as to excuse the default and has failed to demonstrate that a fundamental miscarriage of justice would result if this Court refused to excuse the default.

It is well established in this circuit that the procedural bar set forth in Mich.Ct.R. 6.508(D) constitutes an adequate and independent ground on which the Michigan Supreme Court may rely in foreclosing review of federal claims. *Howard v. Bouchard*, 405 F.3d. 459, 477

(6th Cir. 2005), *cert. denied*, 546 U.S. 1100 (2006). In *Burroughs v. Makowski*, 282 F.3d 410, 413-414 (6th Cir. 2002), the Sixth Circuit considered the language used by the Michigan Supreme Court in this case and found that it presented a sufficient explanation that the ruling was based on the failure to comply with a state procedural rule. *See also*, *McFarland v. Yukins*, 356 F.3d 688, 697-698 (6th Cir. 2004); *Simpson v. Jones*, 238 F.3d 399, 407-408 (6th Cir. 2000). Where a state court denies relief on independent and adequate state procedural grounds, as the state courts did here, a prisoner may only obtain habeas review of such claims if he can establish "cause and prejudice" or that the failure to review the claims would result in a fundamental miscarriage of justice." *Strickler v. Greene*, 527 U.S. 263 (1999). In order to establish "cause" to excuse his default, a habeas petitioner must establish that some objective factor external to his defense prevented him from complying with the state-procedural rule. *Murray v. Carrier*, 477 U.S. 478 (1986).

Here, Petitioner argues that the ineffectiveness of both his trial and appellate counsel suffice as good cause for the failure to raise the claims he presented to the state courts in his

motion for relief from judgment. However, because the claims of ineffective assistance of trial counsel that were raised for the first time in that motion as well as the claim of ineffective assistance of appellate counsel were themselves procedurally defaulted by the state courts, Petitioner cannot use those claims as cause to excuse the default of her remaining claims. *Burroughs*, 411 F.3d at 668.

In any case, Petitioner has not shown that her trial and appellate attorneys were ineffective for not raising the claims she now states should have been raised at trial and in her direct appeal.

As for Petitioner's trial attorney, Petitioner claims in the context of her motion for relief from judgment that trial counsel should have objected to the state law sentencing guidelines because, under the Supreme Court's decision in *Blakely v. Washington*, 542 U.S. 296 (2004), and Supreme Court authority which preceded it. She also claims that trial counsel should have objected "to the jury being given the option of finding murder premised on [her] failure to stop or prevent a crime resulting in death." The failure to raise those objections cannot suffice as good cause to excuse procedural default because the underlying claims are without merit. As for the sentencing claim, Petitioner has not cited any Supreme Court authority, or to a court within this circuit, that indicates the *Blakely* line of cases applies to Michigan's intermediate sentencing scheme. Thus, she simply cannot show (retroactively) that her trial counsel was ineffective for not objecting.

The jury question or instruction claim involves a matter of state law and an interpretation of the elements of a state-law offense (second-degree murder). Resolution of claims or disputes

concerning the elements of state-law offenses is purely a matter of state law not cognizable in federal-habeas review. *Walker*, 703 F.2d at 962. In other words, state courts are the final arbiters

of matters of state law and federal courts will not interfere in such matters. *See Oviedo v. Jago*, 809 F.2d 326, 328 (6th Cir. 1987).

Further, on habeas review, purported errors in jury instructions "are not reviewable unless

they deprive a defendant of constitutional due process." *Gall v. Parker*, 231 F.3d 265, 321 (6th Cir. 2000), *cert. denied*, 533 U.S. 941 (2000). In deciding this question, a federal court reviews whether the instructional error "so infected the entire trial that the resulting conviction violates due process" and considers that "an omission or incomplete instruction is less likely to be prejudicial than a misstatement of the law." *Alder v. Burt*, 240 F.Supp.2d 651, 665 (E.D. Mich. 2003) (citing *Henderson v. Kibbe*, 431 U.S. 145, 154-155 (1977) and *Scott v. Mitchell*, 209 F.3d 854, 882 (6th Cir. 2000), *cert. denied*, 531 U.S. 1021 (2000)).

The trial court's response to the jury's question during deliberation, when considered in context, sufficiently placed the elements of the offense before the jury so as to protect Petitioner's right to due process. The reasons for that are clearly outlined by the Michigan Court of Appeals in its opinion following Petitioner's direct appeal. When read as a whole, as they must, the instructions did not deprive Petitioner of his right to due process. Petitioner's trial counsel had no grounds to object.

Furthermore, the evidence against Petitioner was so overwhelming that any constitutional error in the trial court's response to the jury's question or in the instructions in general was

harmless. *Fry v. Pliler*, 551 U.S. 112 (2007) (holding that, on collateral review, a federal habeas court assesses the prejudicial impact of a state court's constitutional error under the "substantial and injurious effect" standard, not under the more strict "harmless beyond a reasonable doubt" standard, regardless of whether the state court recognized the error and reviewed it under the harmless-beyond-a-reasonable-doubt standard).

Petitioner also asserts that the evidence was insufficient to convict her of second-degree murder. Again, the evidence presented at trial in this matter indicates that Petitioner was guilty of at least second-degree murder both as a principal and on an aiding and abetting theory under Michigan state law.

The Court concludes that Petitioner was not deprived of her right to the effective assistance of trial counsel. She cannot therefore use ineffective assistance of trial counsel as good cause to excuse procedural default.

Regarding appellate counsel, Petitioner's appellate counsel, raised five claims in her direct appeal in the Michigan Court of Appeals. She also filed a motion to remand which was denied. The Court of Appeals issued a detailed opinion ruling against Petitioner on those claims. While Petitioner's appellate counsel did not raise every conceivable claim during the direct appeal, the United States Supreme Court has held that failure to raise every colorable argument does not constitute ineffective assistance of counsel. "A brief that raises every colorable issue runs the risk of burying good arguments—those that, in the words of the great advocate John W. Davis, 'go for the jugular'—in a verbal mound made up of strong and weak contentions." *Jones v. Barnes*, 463 U.S. 745, 753 (1983).

Appellate counsel's actions, of excluding the claims subsequently raised by Petitioner in her motion for relief from judgment in favor of the claims she did, were clearly a strategic decision and does not constitute ineffective assistance of counsel.

Petitioner cannot establish that her appellate attorney was so thoroughly ineffective that defeat was "snatched from the jaws of victory." *United States v. Morrow*, 977 F.2d 222, 229 (6th Cir. 1992) (en banc), *cert. denied*, 508 U.S. 975 (1993); *West v. Seabold*, 73 F.3d 81, 94 (6th Cir. 1996), *cert. denied*, 518 U.S. 1027 (1996). Petitioner has failed to show that his appellate attorney's purported inadequacy deprived him of victory.

In short, Petitioner has failed to establish cause to excuse her default of these claims by either showing that her trial or appellate attorneys were ineffective. As Petitioner has failed to establish cause to excuse her default, there is no need to address the prejudice prong. *Smith*, 477 U.S. at 533; *Long*, 722 F.2d at 289. Further, Petitioner has not shown that a fundamental miscarriage of justice would result if this Court declined to excuse the default. Because Petitioner procedurally defaulted her claims VI through X, by not presenting them in the her direct appeal, by not showing cause and prejudice for her failure to raise them sooner, and by not showing that a fundamental miscarriage of justice would occur from this Court's refusal to consider the claims, review of her those claims is barred.

### G.     Certificate of Appealability

"[A] prisoner seeking postconviction relief under 28 U.S.C. § 2254 has no automatic right to appeal a district court's denial or dismissal of the petition. Instead, [the] petitioner must first seek and obtain a [certificate of appealability.]" *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003). A certificate of appealability may issue "only if the applicant has made a substantial

showing of the denial of a constitutional right." 28 U .S.C. § 2253(c)(2).

> Where a district court has rejected the constitutional claims on the merits, the showing required to satisfy § 2253(c) is straightforward: The petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong . . . . When the district court denies a habeas petition on procedural grounds without reaching the prisoner's underlying constitutional claim, a [certificate of appealability] should issue when the prisoner shows, at least, that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling.

*Slack v. McDaniel*, 529 U.S. 473, 484 (2000).

Reasonable jurists could debate the Court's resolution of Petitioner's constitutional claims or conclude that the issues deserve encouragement to proceed further. The Court therefore **ISSUES** a certificate of appealability on Petitioner's claims. Petitioner may proceed *in forma pauperis* on appeal because an appeal could be taken in good faith. 28 U.S.C. § 1915(a) (3).

## V. CONCLUSION

The state courts' decisions in this case were not contrary to federal law, an unreasonable application of federal law, or an unreasonable determination of the facts. Petitioner has failed to establish that she is presently in custody in violation of the Constitution or laws of the United States.

Accordingly, **IT IS ORDERED** that Petitioner's petition for a writ of habeas corpus [dkt. # 1] is **DENIED**.

**IT IS FURTHER ORDERED** that the Court **ISSUES** Petitioner Titlow a certificate of

appealability and **GRANTS** her an application for leave to proceed on appeal *in forma pauperis*.


                                           s/Marianne O. Battani
                                           MARIANNE O. BATTANI
                                           UNITED STATES DISTRICT JUDGE

Dated: October 19, 2010

CERTIFICATE OF SERVICE

     I hereby certify that on the above date a copy of this Opinion and Order was served upon

the Petitioner and Counsel for the Respondent via ordinary U.S. Mail and electronically.

                                           s/Bernadette M. Thebolt

                                           Case Manager